### Felix v. Kane et al.

*Ella Graubart,* for plaintiff.

*Charles Alvin Jones,* county solicitor, and *Churchill Mehard,* assistant county solicitor, for defendants.

MUSMANNO, J., April 24, 1936.—The complainant, Anne E. Felix, prays that this court enjoin John J. Kane, George Rankin and John S. Herron, commissioners of the County of Allegheny, and John Heinz, director of elections, from using voting machines in 192 districts in Allegheny County because the machines, as at present set up, will permit a voter to vote for 24 alternate delegates at large to the Democratic convention instead of 16.

In preparing the said voting machines for use as aforesaid the names of 16 candidates have been placed upon the voting machines for the position of alternate delegates to the said Democratic convention. Under constitutional and statutory guaranty, a voter, not desiring to vote for any of the 16 candidates whose names appear upon the voting machine, may insert an equal number of names of his own choice on his ballot. The voting machines as prepared by the defendants provide only eight spaces for the insertion of candidates of the voter's own choice whose names do not appear on the voting machine, and thus it is possible for a voter to be deprived of his right to vote for 16 candidates of his own choice for alternate delegates to the Democratic convention.

This defect in the voting machines to be used in the Democratic primaries on April 28, 1936, cannot be corrected as there are only eight spaces available for the insertion of the names of candidates. Even if a voter were permitted to insert two names in each space, the defect would not be cured because, if such permission were given, the voter could vote for 16 candidates of his own choice and eight candidates whose names appear on the voting machines, making a total of 24 votes where the law permits only 16 votes.

It is contended by the complainant that the voting machines as set up will result in their depriving a Democratic voter at the primaries on April 28, 1936, from casting 16 votes for alternate delegates or will permit him to vote for 24 alternate delegates where only 16 offices are to be filled.

After ocular observation of a sample voting machine and hearing evidence on this litigation, the court finds that a voter specifically desiring to destroy the efficacy of his vote as well as contributing votes capriciously for or against others, may actually cast votes for 24 instead of 16. It is not obvious why a voter would do this, because even with the most evil intention it is not clear how he could possibly control, even in the most infinitesimal way, the result of the election for this particular office by perversely voting for more than the law permits him.

Existing statutes provide that voting machines shall be so prepared that a voter will be precluded mechanically from casting more votes than there are offices to fill. The present voting machine is not set up in this way for the office of delegate at large; and a correction, if it can be made, must be ordered by this court.

It is conceded by both sides that the mechanical prohibition desired cannot be effected on this type of a machine. The only alternative is to block out that part of the machine covering the office of alternate delegates at large and substitute paper ballots for the election to that office.

Mark H. Mullen, chief mechanic of the department of elections, testified that it would require the services of two mechanics one hour and a half to adjust the machine so that the keys covering the office in question would remain unmovable.

John Heinz, director of elections, testified that the voting machines now in readiness to be sent to the various election districts must move from the repository at six a.m., Saturday, April 25, 1936.

John J. Kane, chairman of the board of commissioners, testified that it would be impracticable and, in his opinion, impossible, to prepare paper ballots for the 192 districts involved and provide for the necessary equipment and paraphernalia for paper balloting at those places in time for the opening of the polls on Tuesday, April 28th.

It was testified further by various officials and employes of the department of elections that because of the St. Patrick's Day flood new booths had to be ordered for many of the districts in the flood area, and that at the present time there is still a question as to whether the 300 booths ordered to meet this deficiency can be secured in time for the primary election. To require the furnishing of other booths would jeopardize the present schedule, with the ultimate possibility, if not probability, that many voting districts would not be equipped with the devices and paraphernalia required and, as a result, countless voters would be disfranchised. Furthermore, in 80 percent of the voting polls designed to house voting machines there is not space for both machines and booths.

Robert B. Ferguson, testifying for the complainant, stated that the mechanical adjustment asked for would not require more than 30 minutes to a machine.

Considering that the machines are already aligned, covered and prepared for shipment, it would appear to us that 30 minutes per unit would scarcely be enough time to make the complicated change required. Ten to 15 minutes of the precious 30 minutes would be required to take the machine out of its place, remove the cover, unscrew the plates and make it ready for the mechanic. A voting machine is a very cumbersome and complicated piece of machinery. We are inclined to the conclusion, therefore, that the opinion given by Mark H. Mullen conforms more correctly to the time required for the adjustment that that given by others.

We are thus confronted with a physical situation of serious import. It would appear that in the path of the letter of the law there has fallen an insuperable obstacle. However, regardless of the mountainous barrier that may be in the way of achieving a complete compliance with the law, if we are convinced that allowing the machines to go out as they are now set up can conceivably bring about an election not in harmony with the desires of the electorate, we will order the scrapping of the machines rather than that an election result be other than the deliberate wish and intention of the voting public. But it is highly improbable that the use of the machines as they are now set up would bring about a result any different than that which would follow if paper ballots were substituted. The number of offices to fill equals the number of candidates. In other words, only 16 candidates have filed petitions for election to 16 offices.

It would, indeed, be highly phenomenal if the insertion of a few names in 192 districts would appreciably affect the State-wide vote on 16 offices when only 16 candidates have filed. Where the voter illegally and capriciously votes for 24, the candidate whose name is at present on the voting machine label cannot protest, because he will get a vote in any event, whether the voter intended to include him or not. On the other hand, the candidate whose candidacy is to be created only by the writing in of names has no room for complaint because he was not sufficiently interested in the office or election even to take out petitions to have his name inserted on the ballot, a privilege open to every citizen of the State.

We cannot, not only jeopardize, but actually wreck the election machinery in 192 districts for the visionary advantage that may come through the printing of paper ballots. If it becomes necessary for us to decide between a mathematical possibility of benefit and a proven demonstration of disaster, we must decide against the disaster even though in doing so we must apparently offend against a letter or syllable of the law, especially when the

complaint is brought at so late a moment. However, we will not be called upon to make that decision. We can dispose of this question in another way.

We are very much aware that a decision of the court becomes a precedent and we would not want it to be argued and declared at some future date that a defect in a voting machine or an acknowledged irregularity in the election machinery may go uncorrected because the court can balance possibilities and decide whether an illegality does practical damage or not. Every shortcoming in the election machinery is reprehensible, must be condemned and must be corrected. We cannot command that the impossible or the superhuman be done, neither can we decree that the supermechanical be effected, but within the bounds of human and physical limitations we shall order that as many machines as can be adjusted before six a. m., Saturday, April 25th, be serviced. It will be further ordered that, for districts supplied by readjusted machines in accordance with this order, paper ballot be substituted for the office of alternate delegates at large.

## Order

And now, to wit, April 24, 1936, this matter came on to be heard, and upon consideration thereof it is hereby ordered, adjudged and decreed that the defendants, the commissioners of the County of Allegheny and the director of the department of elections of said county, cause such voting machines as can be so corrected before six a. m., Saturday, April 25, 1936, to have the space thereon devoted to alternate delegates at large to the National convention of the Democratic party blocked off, and paper ballots provided instead thereof insofar as available time and skilled labor may permit, and that such voting machines as cannot be so corrected be used elsewhere throughout the county as now scheduled and arranged. It is further ordered that, where paper ballots, in accordance with this order, are used, the enclosure within the voting machine curtain be considered a voting booth, and

that, therefore, the only additional equipment necessary in such cases be the ballot box.